**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| *MS. S., individually and as parent and legal guardian of BS,* | ) ) ) | |
| *Plaintiff* | ) ) | |
| *v.* | ) ) | *No. 2:13-cv-453-JDL* |
| *REGIONAL SCHOOL UNIT 72,* | ) ) | |
| *Defendant* | ) | |

**RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The plaintiff parent appeals from a decision of a Maine Department of Education ("MDOE") hearing officer denying her challenges to decisions of the defendant, Regional School Unit 72, with respect to her son, BS, and his eligibility for services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Maine's laws regarding education of exceptional students, 20-A M.R.S.A. § 7001 *et seq.* The plaintiff asks this court to reverse the hearing officer's decision and enter judgment in her favor, requiring the defendant to reimburse her for costs incurred in placing BS at the Eagleton School, a private school in Massachusetts, and finding that the defendant wrongly failed to provide BS with special education services in the three years preceding his time at the Massachusetts school. Plaintiff's Memorandum of Law ("Plaintiff's Memorandum") (ECF No. 22) at 45. After careful review of the record and the memoranda of the parties, I propose that the court adopt the following findings

of fact and conclusions of law, on the basis of which I recommend that judgment be entered in favor of the defendant.

## I.     Proposed Findings of Fact

Ms. S. adopted BS from Vietnam in 1995 when he was ten months old.  Order [After Administrative Hearing], Record Volume XVI at 3654 ("R. V. XVI at 3654").  BS initially lived in Rumford and received services for developmental delays, particularly in the area of speech-language skills.  *Id.*  In kindergarten, his education was government by an Individualized Education Program ("IEP") issued to him as a student with speech-language impairment.  *Id.*

The family moved to Fryeburg in November 2001.  *Id.*  BS arrived at the Snow School with the same IEP.  *Id.* at 3654-55.  During his second-grade year, the school changed BS's eligibility category to Other Health Impairment.  *Id.* at 3655.  The plaintiff began community-based counseling services for BS at around this time.  *Id.*  During his third-grade year, the school dismissed BS from special education services.  *Id.*

During his fourth-grade year, the school re-identified BS as eligible for special education and related services under the category of a speech and language disability.  *Id.*  During fifth grade, BS received special education services all year.  *Id.*  For his sixth-grade year, BS moved to a different school, where the plaintiff is a teacher.  *Id.*  He continued to be eligible for special education services as a student with speech-language impairment.  *Id.*

BS received IEP services for most of his seventh-grade year.  *Id.* at 3656.  After conducting further testing in the early spring of 2008, it was determined that BS no longer met the criteria as a student with a speech-language impairment, and he was dismissed from special education.  *Id.*  In the spring of 2009, the plaintiff sought a private psychological evaluation with Dr. Michael Broderick in Portland.  *Id.*  The plaintiff referred BS for consideration of his special education

needs on May 14, 2009, based on Dr. Broderick's report. *Id*. She listed BS's suspected areas of disability as "ADHD, language, OHI, social." *Id*.

BS enrolled at Fryeburg Academy beginning in his ninth-grade year. *Id*. Fryeburg Academy is the contract school for high school students residing in Regional School Unit No. 72. *Id*. At an IEP Team meeting held on June 2, 2009, the school determined that BS did not qualify for special education, stating that the evaluation showed no "adverse effect of his working memory with his academics." *Id*.

BS was provided with a 504 Plan in June 2009 in an attempt to address his "core receptive and expressive" language deficits with classroom accommodations. *Id*. at 3657. BS was placed in the "Transition Program" at Fryeburg Academy, with a 504 Plan for ninth grade that provided arrangements for oral presentations; permission to leave class to speak to a designated person; and an allowance to provide delayed responses. *Id*. For the tenth grade, BS was provided with a normal schedule of college-prep courses. *Id*.

The plaintiff made another referral for IDEA evaluation on January 21, 2011. *Id*. The school had Nancy Smith-Jewell, Ph.D., evaluate BS during March and April 2011. *Id*. Dr. Smith-Jewel noted significant concerns with verbal comprehension and working memory, and could not calculate a full-scale IQ. *Id***.** at 3657-58. She also noted that "the picture painted by [Ms. S.] of a boy in psychological distress is not a perception shared across his teachers and administrators . . . [BS] is not demonstrating significant behavioral or emotional challenges within the school setting." *Id*. at 3658. She concluded that BS'S ability to interact socially with his peers in a meaningful way was affected by "significant language issues," but that it "does not appear that his school based behavioral needs necessitate a residential placement at this time." *Id*.

The school's speech and language pathologist conducted a speech-language assessment of BS on April 15, 2011. *Id*. She concluded that although BS's academic grades were "within average," his "overall scores are severely below his peers." *Id*. She reported that teachers "have noted his difficulty with expressing his thoughts and needs in class." *Id*. At his IEP meeting on May 4, 2011, BS was identified as eligible for IDEA services in the categories of speech-language impairment and specific learning impairment. *Id*. at 3658-59.

The school's proposed IEP for BS, to be implemented at Fryeburg Academy, included 45 minutes per week of speech-language therapy and four 45-minute sessions per week of special education services in the Academy's Learning Center. *Id*. at 3659. Classroom accommodations and supports included obtaining additional help outside the classroom, extra time to respond to oral questions, assistance with processing discussion of difficulties, and access to the Learning Center to complete work. *Id*. It did not include any extended school year services. *Id*.

The plaintiff engaged the school's speech and language pathologist for private summer speech and language services in 2011. *Id*. An assessment of BS conducted by Sweetser on June 20, 2011, listed his primary diagnosis as Autistic Disorder, with secondary diagnoses of Mixed Receptive and Expressive Language Disorder and Depressive Disorder NOS. *Id*. BS began to receive Home and Community Treatment services through Kerry Zabicki, LCPC, for 4-6 hours per week at his home. *Id*. at 3659-60.

An IEP Team meeting was held on September 8, 2011, at the request of the plaintiff, to review information from the Sweetser assessment and diagnosis and information on BS's summer programming and plan for the upcoming school year. *Id*. at 3660. The Team did not change the IEP but did require additional reporting between home and school on the social scripts during BS's

speech and language sessions.  *Id*.  BS's eleventh-grade academic schedule included several vocational level courses.  *Id*.

BS's speech and language services provider worked with him for 45 minutes per week, including work on his social skills goals.  *Id*.  She also provided consultation services with other staff, which involved regular communication with the plaintiff and other team members.  *Id*.  She provided consulting services more frequently than the one time per month for 15 minutes called for in the IEP.  *Id*. at 3661.

BS's special education teacher felt that he was benefitting from the program in the fall of 2011.  *Id*.  She testified that BS was more involved with student activities, was expressing himself to teachers, talking more, and "starting to come out of [his] shell."  *Id*.  BS's IEP Progress Report dated October 28, 2011, indicated that he had achieved "limited progress," and his grades were all in the C range or above.  *Id*.

In late October 2011, the special education teacher noticed that BS was missing some of his classes with her.  *Id*. at 3662.  On November 2, 2011, she sent an email to the plaintiff noting that BS had become friends with another student and that she was "hoping he is not following that student's lead."  *Id*.  On November 4, 2011, the plaintiff notified the District's special education director that she would be keeping BS at home due to concerns about bullying and BS's safety at school.  *Id*.

BS's IEP team met on November 9, 2011, to address the plaintiff's safety concerns.  *Id*. The written notice of the meeting indicates that the plaintiff requested that BS receive group-based instruction in social skills.  *Id*.  The team did not address this request. *Id*.  The school's special education coordinator stated that the psychological services provider was working with students individually for scheduling reasons.  *Id*.  The parties later agreed that BS's IEP should be enhanced

to include escort by an educational technician beginning on November 14, 2011, "in all classes and in between classes." *Id.* at 3663. The school agreed to add a behavior plan to the IEP and to have BS meet daily with his advisor. *Id.*

On November 10, 2011, BS left the school after meeting with his special education teacher and the assistant principal without telling anyone. *Id.* at 3664. On November 15, BS was found sleeping in the Academy's "dungeon" when he did not meet his escort at the appointed time. *Id.* The educational technician assigned to escort BS agreed, at his request, to maintain a moderate distance between herself and him to minimize his embarrassment. *Id.* at 3664-65. On December 7, 2011, she and BS had arranged to meet after his final class before lunch, but he left ahead of her and walked away at a speed that did not allow her to keep up. *Id.* The technician went to the location where BS was due to go at lunch time, but BS did not show up. *Id.*

The technician found BS waiting for her at his next class after lunch. Id. She did not tell anyone that he had eloped. *Id.* BS eloped on each of the following two days while being escorted by the technician. *Id.*

On December 14, 2011, it was determined that BS had stolen sneakers from one of the Academy dormitories during his elopement on December 7. *Id.* The Academy's Judicial Board ultimately determine to expel BS from the Academy due to this theft. *Id.* On January 6, 2012, the District held an IEP team meeting to determine whether the theft of the sneakers by BS was a manifestation of his disability. *Id.* at 3666. The team concluded that it was not. *Id.* At this meeting, the team ordered tutoring for BS starting on January 18, 2012, for 2.5 hours a day. *Id.* The school did not provide educational services to BS between December 14, 2011, and January 18, 2012. *Id.*

The plaintiff disagreed with the manifestation decision but decided not to seek readmission of BS. *Id*. At an IEP team meeting held on February 2, 2012, the plaintiff objected to the abbreviated day tutorial schedule, and the written notice for this meeting notes that "[t]eam members all agreed that [BS] required a full-day program." *Id*. The discussion at this meeting centered on alternative educational programs and possible schools for placement. *Id*. at 3667. The REAL School was identified as a possible placement for BS. *Id*.

On February 10, 2012, the director of the REAL School informed the director of special education for the defendant that the REAL School was willing to accept BS as a student. *Id*. The plaintiff and BS looked at a variety of other schools before agreeing to placement at the REAL School starting on February 27, 2012. *Id*. The plaintiff understood that the REAL School program was provided in a shortened day format and expressed concern about the shorter day. *Id*.

BS began Section 28 rehabilitation services at home on February 27, 2012. *Id*. These services were provided by the Maine Department of Health and Human Services ("DHHS") after BS returned home, from about 4:15 p.m. to 7:00 p.m. *Id*. at 3668.

The REAL School is a state-licensed educational program for special or regular education students in grades 7-12, located in Falmouth, Maine. *Id*. It serves disabled and non-disabled students primarily from the Windham/Raymond school district. *Id*. The REAL School is a "project-based" learning center, where students are taught in both traditional and interdisciplinary settings in the community. *Id*. The typical REAL School student has had a difficult time in a traditional school setting. *Id*. REAL School students attend school for 4.5 hours per day and also participate in extended outdoor adventures. *Id*.

BS's speech and language services provider continued to provide speech therapy to BS while he attended the REAL School, working with him from 7:30 to 8:00 a.m. one day per week. *Id.* This was reflected in BS's IEP. *Id.*

On March 30, 2012, the IEP Team met to discuss BS''s placement at the REAL School. *Id.* The plaintiff wanted BS to attend full-day school or tutoring. *Id.* The school declined this request, noting that the REAL School schedule "addresses student[s'] needs throughout the[] day" in a way that is different from traditional schools where students spend time in lunch, study halls, and passing time between classes. *Id.* at 3668-69. The students' outdoor trips are not reflected in the 4.5 hours per day of class time. *Id.* at 3669. The IEP team did not address ESY services for BS at this meeting. *Id.*

As a result of the March 30 meeting, the IEP team decided to continue BS's placement at the REAL School, to keep his current goals, and to add goals with regard to his social behaviors and transition planning. *Id.* BS found a sense of comfort and safety at the REAL School. *Id.* The REAL School conducted a Functional Behavior Assessment and prepared a Positive Behavior Support Plan for BS that was reviewed by the IEP team at the meeting held on March 30, 2012. *Id.* BS's REAL School report card issued on June 19, 2012, indicated grades in the mid 90s for both the third and fourth quarters, and a passing mark for his "adventure based" programming. *Id.* at 3670.

The REAL School's proposal for BS's summer program consisted of 9 hours of social work services and three days of adventure programming. *Id.* The social work services did not take place, but BS met with his special education teacher and attended two summer kayak trips, one of which involved another student. *Id.* at 3670-71. In the summer of 2012, Dr. Slap-Shelton issued a neuropsychological report on findings from evaluations of BS conducted between March

26 and July 21, 2012. *Id*. at 3671. The evaluation was performed at the request of BS's Sweetser case manager and was received by the school on or about August 15, 2012. *Id*.

Many of BS's scores were in the average range, with the exception of vocabulary, understanding directions, and fast paced, less structured memory testing. *Id*. Dr. Slap-Shelton found that BS met the criteria for a diagnosis of autism. *Id*. at 3672. Dr. Slap-Shelton considered BS to be "a candidate for therapeutic residential placement for adolescents with Autistic Disorder and other developmental disorders." *Id*. at 3672-73. In August 2012, BS was evaluated for auditory processing deficits, and the examiner concluded that BS had an integration deficit that adversely affected his auditory processing of language. *Id*. at 3673.

At the IEP Team meeting on August 27, 2012, BS stated that he rated the REAL School as "perfect." *Id*. The plaintiff requested a compensatory placement, reiterating her concerns about the abbreviated academic day and the long commuting time for BS. *Id*. The Team was unable to complete discussion and expressed a need to reconvene as neither Dr. Slap-Shelton nor Dr. Sheckart, who as hired by the school to conduct additional testing of BS, were able to attend. *Id*.

At the follow-up IEP Team meeting held on September 10, 2012, the team reviewed the recent evaluation reports. *Id*. Several concerns were raised about Dr. Slap-Shelton's assessment. *Id*. While there was no dispute about identifying BS as a student with multiple disabilities, the team was unable to reach agreement on the identification of autism. *Id*. at 3673-74. Both the plaintiff and the doctor who diagnosed auditory processing deficits requested increased speech-language services. *Id*. at 3674. The plaintiff requested residential placement. *Id*. Changes were made in the transportation to reduce BS's drive time to the REAL School. *Id*. The Written Notice from this meeting indicated that BS would be assessed by Dr. Sheckart and would be entitled to attend a fifth high school year. *Id*.

Dr. Sheckart conducted several tests of BS on September 18, 2012. *Id*. at 3674-75. He reported that BS had the capacity for organization, insight, and flexibility and that interaction of the processes of thinking with social interactions created pressure points for him. *Id*. at 3675. Dr. Sheckart was not able to opine on the diagnosis of autism. *Id*. at 3676. He testified that a residential placement was unnecessary, and that BS had demonstrated the ability to succeed within the public school framework. *Id*. He did not believe it would be appropriate to place BS at a boys-only residential facility. *Id*.

BS obtained the following grades at the REAL School during the 2012-13 year: English/Language Arts, 98; Math, 98; Science, 98; Social Studies, 95; integrated service learning, P; and adventure-based learning/PE, P. *Id*. at 3677. In progress notes date October 31, 2012, BS's special education teacher noted that BS demonstrated more effective strategies for building and maintaining friendships, participated in discussions and activities, and completed all classroom assignments. *Id*. at 3677-78.

On October 10, 2012, the plaintiff was formally appointed as BS's guardian under Maine law. *Id*. at 3678. She provided the school with a letter dated October 16, 2012, explaining her decision to place BS at the Eagleton School. *Id*. She wrote that she was rejecting "as inappropriate the IEP and placement offered to [BS] for the 2012-2013 school year" and stated that BS was entitled to compensatory services for the past failure of the school to provide BS with a free appropriate public education. *Id*. The school denied her request for reimbursement of the cost of the Eagleton program. *Id*.

Dr. Sheckart issued a follow-up report that relied solely on feedback from BS's REAL School teachers. *Id*. The report noted ongoing concerns about BS's development and maintenance of interpersonal relationships with peers outside of the educational environment and adult

supervision, and that he was engaged and learning as a willing and capable student. *Id*. at 3678-79. BS had seven sessions of direct speech therapy during this school year. *Id*. at 3679. In the November 1, 2012, IEP Team meeting, the school's speech and language pathologist noted that she saw a huge difference in BS after a trip to Florida with the REAL School and that he would have continued to benefit from staying at the REAL School. *Id*. The team reviewed the Sheckart report and denied the plaintiff's request for reimbursement of the cost of the Eagleton program. *Id*.

BS began his programming at Eagleton on November 5, 2012. *Id*. at 3680. He participated in a full-time, 24/7 residential program, with instruction in academics, social skills, and activities of daily living, as well as counseling and therapeutic interventions. *Id*. The Eagleton School serves approximately 60 male students, age 11 and up, with a variety of disabilities. *Id*. Students are grouped by ability and age. *Id*. BS did well at Eagleton and blossomed socially. *Id*. Eagleton's education director felt that BS was ready to transition back to the REAL School in the fall of 2013, provided that he received support for his social/emotional and autism deficits, along with weekly speech and language support for one or two hours. *Id*.

The school reconvened BS's IEP Team for a meeting on March 25, 2013. *Id*. at 3681. Eagleton was utilizing the IEP developed by the team at the November 1, 2012 meeting. *Id*. In collaboration with Eagleton representatives who participated by telephone, the team developed a new IEP for BS, but again called for his placement at the REAL School. *Id*. From November 2012 through August 2013, the plaintiff spent $115,782.30 on BS's program at Eagleton. *Id*.

The defendant agreed to permit BS to complete his education with a fifth year of high school during the 2013-2014 school year. *Id*. He was placed at the REAL School following his completion of the Eagleton program in late August 2013. *Id.*

## II. Discussion and Conclusions of Law

## A. Statute of Limitations

The IDEA defers to state time limits for requesting an administrative hearing from which an appeal may be taken to federal court. Specifically, it provides, in relevant part:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter [20 USCS §§ 1411 et seq.], in such time as the State law allows.

20 U.S.C. § 1415(f)(3)(C).

In Maine, prior to January 2010, the Maine Unified Special Education Regulations, Code Me. R. 05-071 ch. 101 (2012) ("MUSER"), which are approved by the Maine Legislature, specified that a request for a hearing must allege a violation that occurred not more than four years before the date that the parent knew or should have known about the alleged violation and that the hearing request itself must be filed within four years of that date. *See* Exhibit A to Plaintiff's Memorandum, Department of Education, State of Maine, 05-071 Chapter 101, Maine Unified Special Education Regulation, Birth to Age Twenty, Proposed Emergency Refinements, Fall 2009, at XVI.5.A.2 & XVI.13.E. In January 2010, the Maine Department of Education issued the emergency changes it proposed for MUSER. *See* Exhibit B to Plaintiff's Memorandum, Department of Education State of Maine 05-071 Chapter 101, Maine Unified Special Education Regulation, Birth to Age Twenty, Emergency Regulation, January 19, 2010. As was the case with the proposed refinements, the emergency regulations changed the term for the limitation period in which claims must arise from four to two years ( XVI.5.A.2), but made no change in the four-year deadline for filing requests for a hearing (XVI.13.E).

The emergency regulations were submitted to the Maine Legislature for its review. *See* 5 M.R.S.A. § 8071(2)(B), (3)(B). The Legislature authorized final adoption of the emergency regulations as proposed by the Department. L.D. 1741 (124th Legis. 2010) (Exh. C to Plaintiff's Memorandum). Rather than merely issuing a finally-adopted set of regulations as approved by the Legislature, the Department changed the text of section XVI.13.E, changing the limitations period to two years instead of four in November 2010. *See* Exh. D to Plaintiff's Memorandum, Department of Education, State of Maine, 05-071 Chapter 101, Maine Unified Special Education Regulation, Birth to Age Twenty, Final Adoption, 2010, XVI.13.E.

The plaintiff filed for her due process hearing on May 15, 2013. R. V. XVI at 3653. If a two-year limitation period applies, she would be barred from raising any claims that arose prior to May 15, 2011. The hearing officer ruled that he lacked the authority to address the question of whether two-year limitation applied. R. V. I at 54-55. Based on the revised language of section XVI.13.E, he declined to address the plaintiff's claims based on the school years 2009-2010 and 2010-2011. R. V. XVI at 3653.

The plaintiff takes the position that the four-year period in section XVI.13.E of MUSER applies to her hearing request because the change to a two-year period is void under 5 M.R.S.A. § 8057, as a substantive change that was not promulgated in a manner in compliance with the Maine Administrative Procedure Act. Plaintiff's Memorandum at 21-22. Not surprisingly, the defendant contends that the change from four to two years in that section of MUSER was valid because the Department and the Legislature intended to make that change, which was only ministerial; because the Legislature has approved the two-year limitation since 2010; and because the Legislature in 2011 rejected a bill to change the period to six years. Defendant's Memorandum of Law ("Defendant's Memorandum") (ECF No. 25) at 11.

The limitation addressed by section XVI.5.A.2 of MUSER is not applicable to this dispute. It is the application of section XVI.13.E that determines, as a threshold issue, whether the hearing officer should have considered, and whether the court must consider, the plaintiff's claims arising from the school years before May 15, 2011.

The defendant makes much of the fact that the Legislature was informed that the Department of Education intended to amend both section XVI.5.A.2 and section XVI.13.E, changing the period of time in each from four years to two. Defendant's Memorandum at 12-14. However, at least for purposes of statutory construction, legislative intent is irrelevant when the language of the statute is clear. *Phelps v. President and Trustees of Colby College*, 595 A.2d 403, 405 (Me. 1991). In the instant case, the language of section XVI.13.E at the time the Legislature approved it is clear. *Phelp*s, the only authority cited by the defendant, deals with legislative intent, but it rejects an argument that the statute at issue should be interpreted based on the assumption that the Maine Legislature was familiar with the rulings of the Massachusetts courts that had interpreted similar language in a Massachusetts statute. *Id*. at 405-06. Similarly, the question of legislative intent at the relevant time is not reached in this case, because, whether containing the word "four" or the word "two," the meaning of section XVI.13.E is not ambiguous.

The Maine Administrative Procedure Act provides that any rule not adopted in conformity with 5 M.R.S.A. §§ 8052-54 is void. 5 M.R.S.A. § 8057(1). The plaintiff contends that

> [t]he Department never proposed a change from a four-year period to a two-year period for filing claims under the IDEA, never noticed such a change for public comment, and never sent such a proposed change to the legislature for review and approval. This plain failure to comply with the APA compels the conclusion that the two-year language in section XVI.13.E is "void and of no legal effect."

Plaintiff's Memorandum at 21-22. I see no requirement in sections 8052-54 that a proposed change in an agency rule be sent to the legislature for review and approval. That requirement is found in

5 M.R.S.A. § 8071-72. Section 8072 makes the admittedly major substantive rules involved in this case subject to sections 8051 *et seq.* However, the proposed rules were also identified by the Department of Education as emergency regulations, ECF Nos. 21-1 & 21-2, which by the terms of 5 M.R.S.A. § 8054 makes sections 8052 and 8053 inapplicable. Section 8054 does not include any requirements for notice. Emergency rules are only effective for 90 days, however, leaving the court to wonder when and how the rules at issue came into full effect.

On the showing made, I fail to see how the Department of Education failed to comply with the Maine Administrative Procedure Act in promulgating the rules at issue. The defendant, however, does not argue the point, apparently conceding that this is in fact what happened. As the plaintiff notes, the Maine Law Court has held that "[t]he failure of [a rule-making agency of state government] to comply with the rulemaking provisions of the A.P.A. is a procedural defect that we cannot overlook even should we conclude there is no showing of prejudice[,]" citing section 8057. *New England Whitewater Ctr., Inc. v. Department of Inland Fisheries & Wildlife*, 550 A.2d 56, 64 (Me. 1988).

Given that standard, the defendant's contention that the Department of Education's unilateral amendment of section XVI.13.E after legislative approval was received and before the final rules were published was merely a "ministerial" change to "reflect[] legislative intent," Defendant's Memorandum at 11, cannot prevail. The Department of Education's stated intent to change the limitation period created in section XVI.13.E is not consistent with the language that was presented to the Legislature and upon which the Legislature voted. The defendant offers no authority in support of this position, and it is inconsistent with the fact that the rule at issue is itself considered substantive. A whole new area of litigation would open up if state agencies could alter substantive rules after their approval by the Legislature merely by asserting that the changes were

"ministerial." I conclude that the department's unilateral change to section XVI.13.E in November 2010 was ineffective.

That conclusion does not end the matter. The defendant offers two other reasons why the court should find that a two-year limit was in effect when the plaintiff requested an administrative hearing: the Legislature has approved additional changes to MUSER "in almost every year since the 2010 session," and each time the Legislature approved the entire chapter as amended, including a two-year limit in section XVI.13.E; and the Legislature in 2011 rejected a resolve that would have amended the limitation period in section XVI.13.E to six years or four years. Defendant's Memorandum at 14-17. The first of these arguments is persuasive.

The plaintiff objects, asserting that "there has been no indication or suggestion that the Legislature ever considered the 2-year filing deadline in the course of approving any other amendments made to unrelated parts of MUSER since 2011[,]" and that "[t]he Legislature's only duty with respect to proposed major substantive rules is to consider the changes being proposed by the MDOE, not reconsider and/or reapprove the entire set of regulations of which they are a part." Plaintiff's Reply Memorandum of Law ("Reply Memorandum") (ECF No. 26) at 3. She cites no authority in support of these assertions, which suggest that the plaintiff believes that she can have it both ways: the court must disregard evidence that the Legislature considered and meant to adopt the amendment that she contends is void, but must assume, in the absence of direct evidence, that the Legislature did not consider anything other than specific amendments brought to its attention by the Department of Education.

In any event, I disagree. The defendant asserts that "each time the Legislature approved proposed changes [to MUSER], it did so by approving the overall Chapter 101 regulations as amended, rather than simply approving specified changes alone." Defendant's Memorandum at

14-15.  This assertion is supported by documents submitted by the defendant, specifically ECF

Nos. 25-14 and 25-15, both of which present re-adoption of Chapter 101, with amendments, well

before the plaintiff submitted her request for a due process hearing.  The two-year limit appeared

in section XVI.13.E as it was submitted to the Legislature on these subsequent occasions and was

approved by the Legislature. *Id.* The fact that some ongoing or re-elected members of the

Legislature may have assumed that they had already done so makes no difference.

This conclusion makes it unnecessary to consider the defendant's second alternative

argument.  The two-year limitations period applied to the plaintiff's request.

## B.  Specific Misrepresentation

The plaintiff argues that, if the two-year period is otherwise applicable to her request for a

hearing, she nonetheless is entitled to review of the defendant's efforts for the two school years

beginning in 2009 because she was prevented from requesting a hearing for those years in a timely

fashion because the defendant made unintentional misrepresentations to her.  Plaintiff's

Memorandum at 22-26.

Both the federal IDEA statute and MUSER include an exception to the time limit for filing

requests for due process hearings when "the parent was prevented from requesting the hearing due

to specific misrepresentations by the local educational agency that it had resolved the problem

forming the basis of the complaint."  20 U.S.C. § 1415(f)(3)(D)(i); MUSER § XVI.13.F.1.  The

hearing officer concluded that this exception was not applicable in this case because the plaintiff

had not shown that any misrepresentation by agents of the defendant was intentional.  R.V. I at 53.

The plaintiff lists the alleged misrepresentations at issue as the following:

1. An assertion that there was no basis on which to "proceed with the special education

   referral" that the plaintiff made in November 2010, because, "according to the District[,]

[BS] was 'currently successfully completing his academic classes, and teachers report no behavioral issues";

2. The plaintiff was "repeatedly told by her colleagues at the middle school and by Academy staff that BS was doing 'fine' at school and there was no issue at all with his educational progress . . . despite his chronic failure to progress";

3. None of the plaintiff's colleagues explained that "BS required social skill instruction, speech-language therapy, and other special education and related services to receive an appropriate education";

4. In April 2008, the defendant's special education director represented to the plaintiff that "BS's eligibility for services had to be terminated due to a lack of 'adverse effect on *academic* performance'";

5. The defendant represented to the plaintiff that BS did not qualify for special education in June 2009 due to a lack of evidence of "adverse effect of his working memory within his academics"; and

6. The defendant's psychologist represented to the plaintiff in June 2009 that there was "no specialized education needed at [that] time" for BS because the issues upon which she based her referral arose from "a mental health crisis that [went] beyond the school."

Plaintiff's Memorandum at 23-25 (emphasis in original).

The plaintiff contends that she is not required to show that the alleged misrepresentations were intentional in order to qualify for the waiver. As authority for this position, she cites only *RSU 51 v. Doe*, 920 F.Supp.2d 168 (D. Me. 2013) and *Ravenswood City Sch. Dist. v. J.S.,* 870 F.Supp.2d 780 (N.D. Cal. 2012). Both are distinguishable.

In *Ravenswood*, no question was raised as to whether the school district's misrepresentations to the parent were intentional. 870 F.Supp.2d at 788-89. In *RSU 51*, this court was asked to construe the second of two bases for waiver of the time limit stated in 20 U.S.C. § 1415(f)(3)(D). 920 F.2d at 196. The two subsections provide:

> The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to –
>
> (i)   specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or
> (ii)  the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

20 U.S.C. § 1415(f)(3)(D).[1] The school district argued that the word "withholding" in subsection (ii) of the statute required evidence of intentionality. 920 F.2d at 198. This court's examination of this argument was limited to the meaning of the word "withholding," concluding that the hearing officer properly rejected this argument, and rejecting the parents' proffered reliance on case law interpreting the first subsection of the statute. *Id*. at 197-98.

The weight of case law addressing the issue raised here favors the defendant's position. In *D.K. v. Abington Sch. Dist.*, 696 F.3d 233 (3d Cir. 2012), the court, when faced with the argument that the district court's holding that a high threshold of proof applies under the "misrepresentation" subsection of the statute was erroneous, held that

> a rule demanding at least a school's *knowledge* that its representations of a student's progress or disability are untrue or inconsistent with the school's own assessments best comports with the language and intent of the provisions. Therefore, we hold that in order to be excused from the statute of limitations based on § 1415(f)(3)(D)(i) because the school "specific[ally] misrepresent[ed] . . . that it had resolved the problem," plaintiffs must show that the school intentionally misled them or knowingly deceived them regarding their child's progress.

---

[1] Identical exceptions appear in MUSER § XVI.13.F.

*Id*. at 246 (emphasis in original).

Similarly, in *W.H. v. Schuykill Valley Sch. Dist.*, 954 F. Supp.2d 315 (E.D. Pa. 2013), the court, after considering the argument that the school misrepresented the student's progress and that no intent to do so need be proved, held that disagreement with the school district's report "is insufficient" to establish the exception set out in the first subsection of the statute and cited favorably the holding in *Evan H.*, 2008 WL 4791634, at *6, that "[T]o show a 'specific misrepresentation,' Plaintiffs must establish not that the District's evaluations of the student's eligibility under IDEA were objectively incorrect, but instead that the District subjectively determined that the student was eligible to services under IDEA and intentionally misrepresented this fact to the parents." 954 F.Supp.2d at 321-22.

In *C.H. v. Northwest Indep. Sch. Dist.*, 815 F.Supp.2d 977 (E.D. Tex. 2011), the court held that a school district's "subjective and good-faith assessment of [] test results" did not constitute a misrepresentation under the first statutory exception. *Id*. at 985. This holding, thus, requires a showing of intentional misrepresentation as well.

Before applying this requirement to the incidents listed by the plaintiff, I note an additional problem with her list. No showing has been made that any of the individuals alleged to have made the misrepresentations at issue held a position from which he or she could bind the defendant. Specifically, there is no evidence that would allow the court reasonably to conclude that the plaintiff's "colleagues" were acting for the defendant school district when they told her that there was no issue with BS's educational process or failed to explain to her that BS needed certain special education services. For this reason, the second and third incidents on the plaintiff's list cannot provide a basis for application of the misrepresentation exception to the statute of limitations.

The plaintiff does not explain how any of the remaining four incidents on her list could reasonably be construed to exhibit intentional behavior, such that a factfinder could reasonably conclude that the defendant knew that the cited representations concerning BS's progress were untrue or inconsistent with its own assessments, *D.K.*, 696 F.3d at 246, or that it subjectively determined that BS was eligible for services under IDEA and intentionally misrepresented that fact to the plaintiff, *W.H.*, 954 F.Supp.2d at 321-22. In addition, each of the specific listed incidents presents further problems.

The first incident, an "assertion that there was no basis on which to 'proceed with the special education referral' Ms. S. made in November 2010, at a time when BS was failing most of his academic classes and having substantial social difficulties with peers both at school and on social media sites, because (according to the District) he was 'currently successfully completing his academic classes, and teachers report no behavioral issues[,]'" Plaintiff's Memorandum at 23, the record citation given by the plaintiff in support of this allegation does not support the assertion that BS was failing most of his classes or that he was having substantial social difficulties with peers at school, or that the statement in quotation marks attributed to the defendant was otherwise known to the defendant to be false. R. V. VI at 1318, 1321. In addition, the plaintiff does not provide any authority for the assertion, necessarily implied by the above-quoted statement, that a school district is bound by the IDEA to deal with a student's social difficulties on internet web sites.

The second cited incident, that the defendant's special education director in April 2008 represented to the plaintiff "that 'BS's eligibility for services had to be terminated due to a lack of "adverse effect on *academic* performance[,]"'" and the third incident, that the defendant "represented to the plaintiff that BS did not qualify for special education in June 2009 due to a lack

of evidence of 'adverse effect of his working memory within his academics," are similarly unsupported by the citations given to the record. *See* R. V. VI at 1265, 1320, XVII at 3707, 3709. The citations, at most, record the plaintiff's testimony that, in April 2008, she was told "time and time again" by "[a]nybody at a special ed meeting" that BS demonstrated "no adverse effect on his education." R. V. XVII at 3707. However, the defendant agrees that "[f]ormer special education director Nancy Hall did state to the parent that she did not think BS was eligible for special education and that she did not think his circumstances adversely affected educational performance or required special education" in 2008, 2009, and 2010. Defendant's Memorandum at 20. The plaintiff cites no evidence in the record that would allow a factfinder to draw a reasonable inference that Ms. Hall did not actually believe this statement or that there was so much evidence to the contrary in the record that Ms. Hall must have been misrepresenting her belief to the plaintiff.

The plaintiff makes much of her assertion that the defendant told her that BS was ineligible for special education services based solely on his academic performance, while the IDEA requires eligibility to be determined on the basis of both academic performance and functional performance. Plaintiff's Memorandum at 24-25. However, her citations to the record do not support her contention that the defendant based its conclusions solely on BS's academic performance, nor do they support her contention that the defendant told her that only academic performance would be considered under the IDEA. *See* R. V. VI at 1265, 1320, R. V. XVII at 3707, 3709. In fact, BS's PET Team, at a November 2010 meeting, concluded that "[t]here was no basis for the need of specialized instruction for academic or behavioral or emotional issues[;] therefore, the special educational referral did not move forward." R. V. VI. at 1318. MUSER

defines "functional performance" as "how the child demonstrates his/her skills and behaviors in cognition, communication, motor, adaptive, social/emotional and sensory areas." MUSER § II.16.

The final incident listed by the plaintiff is a representation to the plaintiff by the defendant's psychologist in June 2009 that "there was 'no specialized education needed at this time' for BS, because the issues on which she based her referral (including his severe deficits in speech-language and social pragmatic skills) arose from 'a mental health crisis that goes beyond the school.'" Plaintiff's Memorandum at 25. The defendant does not respond directly to this allegation of a substantial misrepresentation that prevented the plaintiff from seeking a due process hearing. The plaintiff characterizes this as a representation that the IDEA does not provide eligibility for services to students who are experiencing mental health issues. *Id.*

That is not a fair characterization of the meeting notes, which present merely a statement of opinion by a school psychologist at a PET Team meeting in June 2009. R. V. VI. at 1371. There is no indication that the psychologist was including BS's "severe deficits in speech-language skills and social pragmatic skills" in his evaluation of BS's mental health status at that time. Nor can the notes be reasonably interpreted as a representation to the plaintiff that special education does not provide any services encompassing mental health issues. It is merely a statement of the psychologist's own opinion that the immediate cause of BS's problems, and perhaps the nature of those problems, was beyond the scope of public education in general. Certainly, the psychologist's reported statement does not purport to represent to the plaintiff that the school district had "resolved the problem," in the language of 20 U.S.C. § 1415(f)(2)(D).

On the showing made, the plaintiff is not entitled to the benefit of the exception to the applicable statute of limitations arising from a specific misrepresentation by the defendant to the effect that it had resolved her complaint.

### C.  FAPE for Eleventh Grade

The plaintiff contends that during the two school years not barred by the statute of limitations in this case, BS was denied a free appropriate public education ("FAPE") by the defendant, because it did not provide him with services necessary to meet the goals set by his IEPs. Plaintiff's Memorandum at 30-38.

The IDEA is designed to ensure "a free appropriate public education" to children with disabilities, one "that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  To reach this goal, Congress provides federal funding to the states, provided that the states implement specific policies and procedures set forth in the IDEA.  *See id*. § 1412(a).  The general prerequisite to a state's receipt of federal funds is the provision of a "free appropriate public education" in the "least restrictive educational environment" to all disabled children residing within the state.  *Id*. §§ 1412(a)(1), (5).  A free appropriate public education consists of an educational program "that emphasizes special education and related services designed to meet the[] unique needs" of each child, *id*. § 1400(d)(1)(A), by affording "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." *Id*. § 1401(29).  By also requiring that education and related services be provided in the least restrictive environment, Congress sought to ensure that children with disabilities are educated alongside non-disabled students "[t]o the maximum extent appropriate," so that "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes . . . cannot be achieved satisfactorily." *Id*. § 1412(a)(5)(A).  *Millay v. Surry Sch. Dept.*, No. 1:09-cv-411-JAW, 2010 WL 5288191 (D. Me. Dec. 8, 2010).

Pursuant to the IDEA, the unique needs of each child are to be set forth in an individualized educational program ("IEP") developed by a team of individuals, including the child's parents, the child's regular and special education teachers, a qualified representative of the local educational agency, various consulting experts and, where appropriate, the child. 20 U.S.C. § 1414(d). In Maine, that team is commonly known as the Pupil Evaluation Team ("PET"). The IEP is a written statement that is developed, periodically reviewed (at least annually), and revised by the PET in accordance with specific procedures set forth in the IDEA. 20 U.S.C. § 1414(d)(3) & (4).

As for adequacy of programming, the IDEA "establishes a basic floor of education" for children with disabilities, guaranteeing them a FAPE, but it does not displace the states from their traditional role in setting educational policy. *Burlington v. Department of Educ.*, 736 F.2d 773, 788 (1st Cir. 1984). Each state is free to calibrate its own educational standards, provided it does not set them below the minimal level prescribed by the IDEA. *Id.* at 788-89. The IDEA does not mandate provision of an ideal program. Rather, a school system is expected only to provide an appropriate public education, one "reasonably calculated to enable the child to receive educational benefits." *Board of Educ. v. Rowley*, 458 U.S. 176, 207 (1982). This assures a "basic floor of opportunity," *id.* at 201; a program offering "a reasonable probability of educational benefits with sufficient supportive services at public expense," *G.G. v., Westmoreland Sch. Dist.*, 930 F.2d 942, 948 (1st Cir. 1991) (citing *Rowley*, 458 U.S. at 1887-89).

BS received educational programs at Fryeburg Academy and the REAL School during the years at issue. With respect to the eleventh-grade year, the plaintiff asserts that the hearing officer wrongly failed to discuss the defendant's alleged failure to provide "social skill instruction for a student with a tremendous deficit in this functional area[.]" Plaintiff's Memorandum at 30. An IEP "must target all of a child's special needs, whether they be academic, physical, emotional, or

social." *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1089 (1st Cir. 1993) (citation, emphasis, and internal quotation marks omitted). The hearing officer acknowledged this standard. R. V. XVI at 3685. However, the court need not consider each of a child's unique needs in isolation and make a separate finding regarding each. 988 F.2d at 1090.

The hearing officer found that the IEP developed for BS in May 2011 was reasonably calculated to address his identified academic and functional needs and included goals to address his speech and language issues as well as his need to interact socially with his peers. R. V. XVI. at 3687.

> Specifically, the Student's IEP included 45 minutes per week of speech-language therapy and four 45-minute sessions per week of special education services in the Academy's Learning Center. The team also ordered classroom accommodations and supports to assist the Student in his regular education settings. These included obtaining additional help outside the classroom, extra time to respond to oral questions, assistance with processing discussion of difficulties, and access to the Learning Center to complete work.

> The evidence supports a finding that the Student was showing signs of progress after his programming began in the fall of 2011.

> * * *

> While it is clear that the Student was not making dramatic gains and still had challenges to overcome, there is evidence that he had made progress in a relatively short period of time, indicating that he was receiving meaningful educational benefit.

*Id*. at 3687-88.

The hearing officer then listed relevant events through BS's formal expulsion from Fryeburg Academy in December 2011 and the initiation of tutoring on January 18, 2012. *Id*. at 3688-89. He held that the defendant failed to provide BS with a FAPE from December 25, 2011, 11 days after his expulsion, through January 18, 2012. *Id*. at 3689. He rejected the plaintiff's contention that BS's subsequent placement at the REAL School was inappropriate because he only

had 4.5 hours of classes per day there, compared to the 6.5 to 7 hours at Fryeburg Academy. *Id.* at 3689-90. He concluded that the eleventh grade placements were otherwise adequate and that BS "was continuing to make demonstrable improvements in his educational and personal skills" at the REAL School. *Id.* at 3690.

Contrary to the plaintiff's characterization, the hearing officer thus did not "completely fail[] to address" any social goals or programming for BS. Plaintiff's Memorandum at 30. The plaintiff complains particularly that the IEP for this year did not include "direct social skills instruction," *id.*, but the IDEA does not require a school district to provide a student with his parent's first choice for services. *See G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 948 (1st Cir. 1991); *see also Lenn*, 998 F.2d at 1090-91 (upholding school district's plan to address student's social skills needs, even though it might not be the best mechanism for addressing those needs and might not generate the best possible results).

The plaintiff also recites a litany of BS's perceived problems "at the end of tenth grade," and asserts that the IEP at issue "was a highly inappropriate program in no way tailored to help BS advance in his areas of deepest deficit." Plaintiff's Memorandum at 31-32. She cites no authority in support of this conclusion. She goes on to complain that the defendant's approach "left BS vulnerable to social isolation, scorn, and derision, and ultimately led to his expulsion form the Academy." *Id.* at 32. She provides no citation to the record to support this allegation, and, in fact, the latter statement is directly contradicted by the finding at the "manifestation determination" on January 6, 2012, that the event that resulted in BS's expulsion from Fryeburg Academy was *not* a manifestation of the disabilities that his IEP had been created to address. R. V. V at 941.

Finally, the plaintiff challenges that failure of this IEP "to include any extended school year services" for the summer of 2011. Plaintiff's Memorandum at 33. She cites no evidence in support

of her apparent contention that BS was entitled to such services. Indeed, she asserts that the hearing officer "failed to take into account [the] fact that the extra supports BS had received during the preceding summer resulted from the efforts of his mother" rather than the defendant. *Id*. She does not explain how taking this fact into account would negate the fact that BS was showing signs of improvement "after [, not before,] his programming began in [the] fall of 2011[,]" *id*., and no reason why this would be so is readily apparent.

The hearing officer addressed this claim as follows:

> The Guardian asserts that the School deprived the student of a FAPE by failing to provide him with Extended School Year Services (ESY) during the summer of 2011 and the summer of 2012. As set forth in MUSER, Extended School Year Services must be provided only if a child's IEP Team determines that the services are necessary for the provision of FAPE to the child. MUSER § X.2.A.(2)(7)[.] MUSER specifies that the need for ESY and particular services is demonstration by means of:
>
> (a) A review by the child's IEP Team of relevant information including, but not limited to, progress reports and relevant assessments, parent report, observations or documentation;
> (b) Consideration by the child's IEP Team of the significance of the child's disability, progress toward IEP goals; and
> (c) Consideration of the impact of previous service interruptions, if applicable, and the probability that the child is unable to recoup, in a reasonable amount of time, skills previously mastered.
>
> MUSER § X.2.A.(2)(7)[.]
>
> While the Guardian argues that the School should have provided ESY, she offered little evidence that suggests that the School inappropriately deprived him of this service. In the present case, the May 2011 IEP Team reviewed the evaluations of Nancy Smith-Jewell, Ph.D., and Carie Heath conducted in March and April 2011. While both evaluators noted concerns with regard to the Student's working memory, neither identified concerns with regard to previous service interruptions or the Student's ability to recoup previously mastered skills. There was no evidence of any regression or recoupment concerns for the Student noted at the March 30, 2012, IEP Team meeting. Accordingly, the Guardian has not satisfied her burden to establish that the School deprived the Student of a FAPE by

> failing to provide him with Extended School Year Services (ESY) during
> the summer of 2011 or 2012.

R. V. XVI at 3693. On the showing made, nothing further was required.

The plaintiff also contends that the hearing officer "glosses over how poorly BS performed in eleventh grade[.]" Plaintiff's Memorandum at 34. She asserts that reports of limited progress by BS were "an exaggeration," *id.*, but her evaluation of the reports that she cites in support of this assertion is not the only possible interpretation. The hearing officer's evaluation is reasonable. *See, e.g., Millay*, 2010 WL 5288191, at *31 (court's standard of review in IDEA cases is more vigorous than clear-error review but less vigorous than *de novo* review; where decision rests on matter of educational policy, it is due a greater degree of deference).

The plaintiff faults the defendant for not providing unspecified services that would have prevented BS from leaving the Academy campus during the school day "due to adverse social interactions with peers." Plaintiff's Memorandum at 35. An IEP is not required to produce complete success; the IDEA "requires an adequate, rather than an optimal, IEP." *Lenn,* 998 F.2d at 1086. *See also Mr. G. v. Timberlane Reg'l Sch. Dist.*, No. 04-cv-188-PB, 2007 WL 54819, at *10 (D.N.H. Jan. 4, 2007) ("In assessing the adequacy of the IEP, I do not consider whether another program would have been 'better' but only whether the District's IEP was reasonably calculated to provide [the student] with some educational benefit, and whether [the chosen school] could implement it.'). In the absence of any evidence that direct "social skills instruction[]," Plaintiff's Memorandum at 35, would necessarily have significantly reduced BS's elopements or significantly improved his relationships with his peers during his first two months at a new school, the plaintiff takes nothing by this argument.

The plaintiff concludes with a challenge to BS's placement at the REAL School, were she admits that he experienced "reduced social pressure." *Id.* She contends that his IEP should have

been amended immediately upon receipt of a report from Dr. Richard Anderson in January 2012 who recommended extensive additional services, which the REAL School could not provide. *Id.* at 35-36. She cites no authority in support of this argument. She also asserts, without citation to the record or authority, that the 4.5 hours-per-day schedule at the REAL School was "not a proper placement" because "[s]he knew that BS needed a full day or more of services to progress[.]" *Id.* at 36.[2]

In the absence of any citation to evidence other than the plaintiff's opinion, this final attack cannot succeed. *See, e.g., Mr. G.*, 2007 WL 54819, at *10.[3]

### D. FAPE for Twelfth Grade

The plaintiff contends that the IEP for BS's twelfth grade year was inadequate because testing by Dr. Laura Slap-Shelton in the spring of 2012 to support the plaintiff's application for legal guardianship of BS, R. V. III at 501, showed, *inter alia*, that BS's "adaptive skills were extremely low," and he reported "significant difficulty functioning in terms of his daily living skills." Plaintiff's Memorandum at 37. Dr. Slap-Shelton opined that BS was "a candidate for therapeutic residential placement for adolescents with Autistic Disorder and other developmental disorders. He will require a program which has the teaching of social skills built into daily treatment and behavior goals." R. V. II at 465.

The plaintiff asks the court to infer from the fact that the defendant's "own psychologist . . . declined to answer the question" of whether the REAL School program was appropriate to

---

[2] The facts that the plaintiff "wrote to REAL School teachers and administrators in June and July, 2012 about how happy she was with the staff and programming at the REAL School[,]" R. V. XVI at 3690, and returned BS to the REAL School after his twelfth grade year at the Eagleton School, R. V. XII at 2759-60, appear inconsistent with the fervor with which she now attacks that programming.

[3] The defendant contends that a lesser legal standard applies to the court's review of the hearing officer's decision with respect to the REAL School placement because BS had been dismissed from Fryeburg Academy. Defendant's Memorandum at 26-27, 40-41, but there is no need under the circumstances presented by this appeal to decide whether this "lesser" standard is applicable.

address [BS's] educational needs that "[h]is silence should speak volumes," and, apparently, that this expert felt that the program was not appropriate. Plaintiff's Memorandum at 38. Actually, after Dr. George Sheckart, the defendant's psychologist, had stated in his testimony at the due process hearing that his "role was not to make a diagnosis[,]" and that "the IEP was written to address [BS's] needs[,]" R. V. XVIII at 3929, he was asked, "[a]re you uncomfortable weighing in on the question of whether that program [at the REAL School] he was receiving under that IEP was appropriate to address his educational needs?" He responded, "I don't think I'm the best person to answer that question. I did ask [BS] how he liked the REAL School, whether he was satisfied being there and he did say to me, yes, that he did." *Id*. Read in context, Dr. Sheckart's answer cannot reasonably be construed to constitute an opinion that the placement was inadequate.

The plaintiff cites no evidence or authority to support her contention that the defendant should have adopted Dr. Slap-Shelton's recommendations. The hearing officer addressed Dr. Slap-Shelton's report as follows, in relevant part:

> Dr. Slap-Shelton's evaluation revealed, however, that since 2011 the Student had shown some growth in his verbal comprehension and working memory scores, two challenging areas for the Student. . . . While not showing dramatic growth, these evaluations corroborate other evidence that the Student was making progress during his placement at Fryeburg Academy and the REAL School.

R. V. XVI at 3691. The hearing officer then recounted in some detail Dr. Sheckart's testimony, as well as reports from REAL School faculty, that demonstrated progress by BS in several areas, including social skills. *Id*. at 3691-92.

The hearing officer concluded that the IEP developed in April 2012 was reasonably calculated to address BS's academic and functional needs and, therefore, provided him with a FAPE. *Id*. at 3692. I agree with the hearing officer that the fact that the Eagleton School, where the plaintiff unilaterally placed BS in November 2012, used that IEP during BS's time there is

significant. *Id*. at 3693. Again, the question before the court is not whether a different IEP or a different placement would have better served BS; it is whether the IEP at issue, with placement at the REAL School, was reasonably calculated to provide BS with meaningful educational benefits. *Lenn*, 998 F.2d at 1086. The plaintiff has not carried her burden to show that it was not. *E.g., González v. Puerto Rico Dep't of Educ*., 254 F.3d 350, 353 n.2 (1st Cir. 2001).

### E.   Request for Compensatory Relief

The plaintiff contends that she is entitled to reimbursement of the cost of BS's attendance at Eagleton School from November 2012 through June 2013. Plaintiff's Memorandum at 39-44. If the court upholds the hearing officer's decision that the defendant provided BS with a FAPE for that school year, as I recommend, this request is moot.

### III.   Conclusion

For the foregoing reasons, I recommend that the hearing officer's decision be **AFFIRMED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 29th day of November, 2014.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge